# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Carlos Gomez-Robles,<br><br>　　　　Defendant. | No. CR-17-0730-TUC-CKJ (JR)<br><br>**REPORT & RECOMMENDATION** |

Pending before the Court is Defendant Carlos Gomez-Robles's Motion to Suppress Statements and Evidence for Fourth Amendment Violation (Doc. 29). The Government filed a Response (Doc. 36) and the Defendant replied (Doc. 44). The parties also filed supplemental memoranda (Docs. 45, 46). Defendant is charged with one count of Illegal Reentry in violation of 8 U.S.C. § 1326(a) and enhanced by 9 U.S.C. § 1326(b)(1). (Doc. 7 (Indictment)). In his motion, Defendant seeks the suppression of all evidence obtained as a result of his alleged unlawful detention based on an immigration hold enforced upon his release from the Pima County Jail.[1]

Pursuant to LRCrim. 5.1(a), this matter was referred to Magistrate Judge Rateau

---

[1] Defendant also filed a Motion to Suppress Statements for Miranda Violation (Doc. 28). That motion was withdrawn based on the Government's stipulation that any statements made to federal officers would not be used at trial (Doc. 48). The Magistrate Judge will hear Defendant's Motion to Suppress Statements for Miranda Violations (Doc. 53) and the Government's Motion in Limine to Admit Defendant's Statements to Tucson Police (Doc. 43) on December 1, 2017 at 9:30 a.m. (Doc. 56 (Order Setting Hearing)).

for an evidentiary hearing and a report and recommendation.[2] On November 7, 2017 the Court conducted an evidentiary hearing.[3] The Government called two witnesses, Department of Homeland Security, Immigration and Customs Enforcement Deportation Officers Martin Renteria and Roderick Norl. The Defendant did not call any witnesses. (Doc. 88 (Minute Entry)). Based on the pleadings, testimony, and arguments of counsel, the Court recommends that the District Court, after its independent review, deny Defendant's motion.

**I.  Hearing Testimony**

Officer Renteria, the case agent in this case, is assigned to the Immigration and Customs Enforcement ("ICE") Violent Criminal Alien Section ("VCAS") where his duties include the review of alien administrative files. TR11, 37. Officer Renteria is the custodian of the Defendant's A-file and reviewed the file prior to the hearing. TR14-15. Defendant's A-file reflects that he was arrested by officers from the Tucson Police Department at approximately 11:00 p.m. on April 5, 2017 and charged with aggravated DUI, criminal damage, endangerment, and possession of drug paraphernalia. TR15-16. He was booked into the Pima County Jail on April 6, 2017. TR15.

At approximately 6:00 a.m. on April 6, Deportation Officer Ricky Jackson from the ICE Enforcement and Removal Operations ("ERO") Criminal Alien Program ("CAP"), whose duties are to review jail lists and identify and establish alienage and removability of individuals who are in state and federal custody, identified through a list on a specialized website that the Defendant was in custody at the Pima County Jail. TR12-13, 16-18, 22, 38, 45. The list included a photograph of the Defendant and reflected his country of citizenship, FBI number, and the criminal charges he was being held on. TR22-23. With that information, ICE ERO officers conducted a check through the Central Index System ("CIS") to determine the Defendant's legal permanent resident

---

[2] The plea deadline is December 22, 2017, and trial is set for January 9, 2018. (Doc. 40).

[3] The transcript is cited herein as "TR" followed by the page number where the cited testimony appears.

- 2 -

status, any nonimmigrant status, naturalized United States Citizen status, and any prior immigration violations in the United States. TR19-20, 22-23. The check reflected that the Defendant had been previously removed from the United States and "had a final order of removal from an immigration judge." TR23, 46.

Based on the information obtained through the CIS, a Form I-247A Department of Homeland Security ("DHS") Immigration Detainer was faxed to the Pima County Jail. TR20-21, 23-24, 26; Gov. Ex. 2 (Immigration Detainer). In relevant part, the detainer states that "**DHS HAS DETERMINED THAT PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN.**" The form indicates that the determination of probable cause was based on "[a] final order of removal against the alien." Gov. Ex. 2, p. 1. Based on that determination, the form requests that the Pima County Jail "**Notify DHS** as early as practicable (at least 48 hours, if possible) before the alien is released from your custody." *Id*. The form further requests that the jail "**Maintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody." *Id*. The detainer is signed by Deportation Officer Jackson. *Id*.

ICE ERO CAP officers went to the Pima County Adult Detention Center on April 6 and, without providing any *Miranda* warnings, interviewed the Defendant and obtained biographical information such as his country of birth and citizenship. TR23-24, 39, 42; Gov. Ex. 5 (Form I-213 reflecting interview encounter); Def. Ex. 8 (interview sheet). Based on all the information, it was determined that the Defendant had previously been encountered and removed from the United States and that probable cause existed "for an administrative violation." TR24. At 8:14 a.m., a Form I-200 warrant for the Defendant's arrest was faxed to the jail. TR25-26; Gov. Ex. 1 (Warrant for Arrest of Alien and fax confirmation sheet). The warrant is signed by an "authorizing eviction officer" who in this case was ICE Supervisor Detention and Deportation Officer Julia Ordaz. TR26, 47-48. The Form I-200 is a "check the box" form that offers five different potential probable cause bases for removal. Gov. Ex. 1. In this case, the probable cause basis selected

states that:

> biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law;

Gov. Ex. 1.

On Friday, April 14, 2017, the local charges against the Defendant were dismissed. TR27; Def. Ex. 1 (dismissal document). ICE was informed by telephone call placed at 2:21 p.m. and by an email sent at 2:27 p.m. by Leann Lopez of the Pima County Sheriff's Department that the local charges had been cleared and that the Defendant was available for pick-up and would be held until 4:10 p.m. TR28-29; Gov. Ex. 3 (copies of emails). The Defendant was subsequently picked up and transported to the Tucson ERO suboffice, arriving at approximately 5:06 p.m., for administrative immigration processing by CAP Deportation Officers who booked the Defendant into the ICE database and took his photograph, fingerprints and a sworn statement after being provided an administrative warning. TR30-31, 52-54, 67. The fingerprints were submitted to the FBI's Next Generation Identification System which provides a complete criminal history and an Interview Worksheet reflects the date and location the Defendant entered the United States without inspection. TR30-32, 57-58; Def. Ex. 8 (Interview Worksheet). The Defendant was then served with a reinstatement and because his case met the relevant prosecution criteria, it was referred to the VCAS unit for prosecution. TR30-32, 57, 69 (indicating that prior criminal convictions and last removal date are the main considerations in determining whether case is amenable to prosecution), 72.

After the case was referred, the Defendant was read his *Miranda* rights and a probable cause statement, including a hold request, and an attached Form I-213 record of deportability/inadmissible alien, was emailed at 5:20 p.m. to the duty Magistrate Judge. TR32-35, 67, 73 (indicating that the purpose of the probable cause statement was to authorize a 48-hour hold of the Defendant for prosecution the following Monday), 76; Gov. Ex. 4 (probable cause statement and confirming e-mail); Gov. Ex. 5 (I-213). The

- 4 -

probable cause statement includes information about how the Defendant came into ICE custody, his last entry and removal dates, citizenship information, criminal convictions, and alleges that he does not have any documents or permission to remain in the United States. TR33-34; Gov. Ex. 4. In the confirming email, the Magistrate Judge indicated that notification would be sent only if the court determined that there was a lack of probable cause. TR34, 60, 78; Gov. Ex. 4. After there was no response from the Magistrate Judge, the Defendant was transported to the Florence Detention Center. TR36, 78-79. On Monday, April 17, 2017, a sworn complaint was prepared charging the Defendant under 8 U.S.C. § 1326(b)(1). TR36, 81-82. The Defendant was then presented for an initial appearance. TR36-37.

## II. Discussion

Defendant argues that his continued detention at the Pima County Jail based on the Form I-247A Immigration Detainer and the I-200 Warrant for Arrest of Alien violates the Fourth Amendment because neither the detainer nor the warrant were judicially authorized and did not confer probable cause to support his continued detention beyond the termination of the state charges.

The Defendant's arguments fail on their merits for the straightforward reason that federal law provides both the authority for DHS to issue immigration detainers and for law enforcement agencies, like the Pima County Jail, to detain those identified in those detainers. DHS issues immigration detainers pursuant to 8 C.F.R. § 287.7. That regulation states that "[a] detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Detainers are used in situations where it is impracticable or impossible for DHS to assume immediate custody over a person. *Id*. As authorized by the regulation, detainers ask that cooperating agencies detain an alien "not otherwise in custody" for no longer than 48 hours, excluding Saturdays, Sundays, and holidays. 8 C.F.R. § 287.7(d). The regulation also expressly authorizes several types of immigration officers to issue immigration detainers.

8 C.F.R. § 287.7(b) (listing officers authorized to issue immigration detainers). These include, as relevant here, "supervisory and managerial personnel who are responsible for supervising the activities of" immigration enforcement agents, among others. 8 C.F.R. § 287.7(b)(1)–(8). Thus, under the provisions of 8 C.F.R. § 287.7, the Pima County Jail was authorized to maintain custody of the Defendant for up to 48 hours beyond the time he would otherwise have been released to allow DHS an opportunity to assume custody.

Despite the express authorization found in 8 C.F.R. § 287.7, the Defendant contends that at least two district court cases from the Ninth Circuit have found detentions of the sort at issue here violate the Fourth Amendment. The first of these two cases, *Miranda-Olivares v. Clackamas Cnty.*, No. 3:12-cv-02317–ST, 2014 WL 1414305 (D.Or. Apr. 11, 2014), is readily distinguishable from the Defendant's case. Miranda-Olivares was arrested on March 14, 2012 for violating a domestic violence restraining order and booked into the Clackamas County Jail. The following morning, the jail received a Form I-247 Immigration Detainer requesting that the jail maintain custody of Miranda-Olivares for a period not to exceed 48 hours after she would have otherwise have been released. The detainer further stated that DHS had initiated an investigation to determine whether Miranda-Olivares was subject to removal and the box indicating that and order of deportation had been obtained had not been checked. That same day, Miranda-Olivares was arraigned on the state charges and the court set $5,000.00 bail. However, Miranda-Olivares and her family members were told that any attempt to post bail would be futile because, even if bail was posted, she would not be released due to the detainer. On March 29, 2012, Miranda-Olivares pled guilty and was sentenced to 48 hours in jail with credit for time served. Miranda-Olivares would have been released at that time, however, due to the detainer, she remained in custody for an additional 19 hours until she was released to the custody of DHS agents.

Miranda-Olivares subsequently sued Clackamas County under 42 U.S.C. § 1983 alleging, inter alia, that her Fourth Amendment rights were violated by the County's refusal to release her during the two weeks she could have posted bail and by her

continued detention for 19 hours after her release on the state charges. In addressing the Fourth Amendment claim, the district court initially determined that "[t]he seizures that allegedly violated her Fourth Amendment rights were not a continuation of her initial arrest, but new seizures independent of the initial finding of probable cause for violating state law." The court explained that Miranda-Olivares's continued detention on the ICE detainer resulted in subsequent and new "prolonged warrantless, post-arrest, pre-arraignment custody." *Id.* (quoting *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1042-43 (9th Cir. 1996)). The court went on to explain that:

> Miranda-Olivares was not charged with a federal crime and was not subject to a warrant for arrest or order of removal or deportation by ICE. The County admits that Miranda-Olivares was held past the time she could have posted bail and after her state charges were resolved based exclusively on the ICE detainer. But the ICE detainer alone did not demonstrate probable cause to hold Miranda-Olivares. It stated only that an investigation "has been initiated" to determine whether she was subject to removal from the United States. The ICE detainer's stated purpose of requesting the Jail to hold Miranda-Olivares custody was "to provide adequate time for [ICE] to assume custody" of her. Therefore, it was not reasonable for the Jail to believe it had probable cause to detain Miranda-Olivares based on the box checked on the ICE detainer.

*Miranda-Olivares*, 2014 WL 1414305 (internal citation omitted).

The facts the Oregon district court addressed in *Miranda-Olivares* are distinguishable from the instant case in several significant respects. The Defendant in this case has presented no evidence indicating that he was eligible for bail and would been released on the state charges if not for the existence of the detainer. To the contrary, the evidence presented to the Court establishes that he remained in custody on the state law charges until April 14, 2017 when the local charges against him were dismissed. ICE was informed by a telephone call placed at 2:21 p.m. and by an email sent at 2:27 p.m. that the local charges had been cleared. The Defendant was then held as authorized by 8 C.F.R. § 287.7 until he was picked-up and transported to the Tucson ERO suboffice later that afternoon. Moreover, as the Oregon court noted, a detainer stating only that an

investigation had been initiated to determine whether a defendant was subject to removal, as was the situation in *Miranda-Olivares*, is quite different from a probable cause finding based on an order of removal or deportation, as was the situation in this case. Thus, the factual differences between *Miranda-Olivares* and the instant case render the legal analysis in *Miranda-Olivares* unhelpful in the resolution of this case. The Defendant here was held subject to a previous order of removal and, except for the few hours after his release on state charges, was not held at the jail due to the detainer when he otherwise would have been released.

The second case upon which the Defendant heavily relies is *Sanchez-Ochoa v. Campbell*, No. 1:17-CV-03124, 2017 WL 3476777 (E.D. Wash. July 31, 2017), a case presently on appeal from the Eastern District of Washington. In that case, defendant Sanchez-Ochoa was charged with second degree assault and malicious mischief. *Id*. at 3. While being held at the Yakima County jail, he was interviewed by ICE officials and admitted that he was a citizen of Mexico. *Id*. at 4. DHS then issued an administrative warrant for Sanchez-Ochoa's arrest using Form I-200. The warrant alleged that probable cause existed for Sanchez-Ochoa's arrest based on the "statements made voluntarily" by Sanchez-Ochoa. *Id*. at 4-5. Jail officials then placed an "immigration hold" on Sanchez-Ochoa's jail roster, citing "ICE" as the relevant statute giving rise to his detention. *Id*. at 5. Sanchez-Ochoa then sued Yakima County and its jail officials alleging that he had the resources to pay his bond on the state charges, but that jail officials would not accept bail because of the immigration hold. *Id*. at 7.

After filing his lawsuit, Sanchez-Ochoa filed a motion for a temporary restraining order ("TRO") asking the District Court to direct the county defendants to remove the immigration hold so that he could post bail on the state charges and be released. *Id*. The District Court, examining Sanchez-Ochoa's likelihood of success on his Fourth Amendment claim under TRO standards first concluded that his continued detention pursuant to the immigration hold fell within the scope of the Fourth Amendment. *Id*. at 18-19. The court then examined whether the immigration hold caused or would cause

Sanchez-Ochoa to remain in custody longer than he otherwise would have on the basis of the state charges alone. *Id*. at 20. The court concluded that Sanchez-Ochoa's allegation that he would continue to be detained on the basis of the immigration hold was well supported and resulted in a seizure for Fourth Amendment purposes. *Id*. at 24. The court then noted that the probable cause finding in the Form I-200 warrant was made by an ICE officer, and not a neutral magistrate, and that it was not supported by any factual detail. *Id*. at 25. Additionally, the court noted that the warrant at issue "is not a final order of removal and it is not an immigration detainer request directed at Defendants asking them to hold Sanchez-Ochoa," and was not directed to the jail, but to "any immigration officer" and that its service on jail officials "did not magically convert it into . . . a request [for cooperation], direction, authorization, or other instruction form DHS to Defendants seeking their assistance in detaining Sanchez-Ochoa." *Id*. at 32-33. Because the I-200 warrant contained no such request, the court concluded that:

> Defendants could not "hold" Sanchez Ochoa in any sense of the word based solely on an administrative warrant that reflects only the *suspicion* that Sanchez Ochoa is removable from the United States. Exchanging information and cooperating is one thing. What happened here was quite another—it was detention.

*Id*. at 35. Thus, the court found that Sanchez-Ochoa was likely to succeed on the merits of his Fourth Amendment claim and issued the requested TRO directing the defendants to remove the immigration hold and release Sanchez-Ochoa if he posted bail on the state charges. *Id*. at 43-44.

While much of the *Sanchez-Ochoa* decision is consistent with the arguments the Defendant advances in this case, the distinguishing characteristics between the facts of that case and that of Defendant's case are too great and, without greater guidance from the Ninth Circuit, cannot be extended to the degree necessary to support granting Defendant's requested relief in this case. For example, *Sanchez-Ochoa* involved only a Form I-200 warrant, and not a Form I-247 detainer, and the court specifically noted that the Form I-200 was insufficient to convey a request for cooperation from jail officials.

Here, of course, both a Form I-200 and a Form I-247 detainer were delivered to the Pima County Jail and the Form I-247 provided specific information about the detainer request. The Washington court was also critical of the probable cause basis identified in the Form I-200. The federal authorities noted only that it was based on voluntary statements from Sanchez-Ochoa, but did not provide any specific information. Here, the probable case allegation was based on a previous order of removal which is certainly a more substantial basis than that described in *Sanchez-Ochoa*. Additionally, like the *Miranda-Olivares* court, the *Sanchez-Ochoa* court was faced with a factual situation where a detainee was denied bail due to an immigration hold. As noted above, the Defendant in this case has presented no evidence indicating that he was eligible for bail and would been released on the state charges if not for the existence of the detainer. Thus, as was the case with *Miranda-Olivares*, the factual differences between *Sanchez-Ochoa* and the instant case render the legal analysis in that case unhelpful in the resolution of Defendant's motion here. Again, given that the Defendant here was held subject to a previous order of removal and was not held at the jail due to the detainer when he otherwise would have been released, the Court would be comfortable granting the requested relief only on controlling authority finding a Form I-247 detainer unconstitutional in similar circumstances. Until and if that occurs, the Defendant's arguments must be rejected.

In a related argument, Defendant contends that his identity and fingerprints are subject to suppression if obtained in violation of the Fourth Amendment. In *United States v. Del Toro Gudino*, 376 F.3d 997 (9th Cir. 2004), the Ninth Circuit addressed a similar argument and explained:

> Our cases treat identity different from other kinds of evidence. Where mere identity is involved, the relevant circuit authority is *United States v. Guzman-Bruno*[, 27 F.3d 429 (9th Cir. 1994)]. *Guzman-Bruno*, like the case at bar, was a criminal prosecution under 8 U.S.C. § 1326. Like the case at bar, the defendant in *Guzman-Bruno* argued that all evidence of his identity learned in connection with his illegal arrest should be suppressed. We disagreed, reasoning that prior Supreme Court and Ninth Circuit precedent "clearly foreclose[d] Guzman-Bruno's attempt to suppress the fact of his identity." We have consistently followed *Guzman-Bruno's*

holding as to identity evidence in a line of cases under § 1326.

*Id.* at 1000 (footnotes omitted). Moreover, although fingerprints may be subject to suppression under the Fourth Amendment, *see United States v. Ortiz-Hernandez*, 427 F.3d 567, 577 (9th Cir. 2005), the Ninth Circuit nevertheless has held that the government could obtain another set of the Defendant's fingerprints for purposes of proving his identity at trial:

> While the original set of [the defendant's] fingerprints should be suppressed as wrongfully obtained, the government is now aware of [the defendant's] identity; it may rely on his identity as well as his criminal and immigration record, in bringing § 1326 charges against him. As we have previously articulated, "there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence" being brought before the court. *Guzman-Bruno*, 27 F.3d at 422 (internal quotation and citation omitted.)

*Ortiz-Hernandez*, 427 F.3d at 577 (citations omitted). Thus, even if the Court were to find a Fourth Amendment violation, which it has not, suppression of the Defendant's identity and fingerprints is not warranted.

### III. Recommendation

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, DENY Defendant's Motion to Suppress Statements (Doc. 29).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court. If any objections are filed, this action should be designated case number: **CR 17-0730-TUC-**

**CKJ**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 28th day of November, 2017.

> _____
> Honorable Jacqueline M. Rateau
> United States Magistrate Judge